OPINION OF THE COURT
 

 Hancock, Jr., J.
 

 Defendant was indicted together with her father and other accomplices for second degree murder and other crimes in connection with the death of her husband. She pleaded guilty to the murder count and was sentenced in accordance with a negotiated plea to 18 years to life. At the time set for sentencing she moved unsuccessfully to withdraw her plea, claiming that it was coerced because the favorable plea bargain offered at the same time to her father was conditioned upon her
 
 *539
 
 acceptance of the plea offer. The Appellate Division unanimously affirmed.
 

 Defendant contends before our Court that her guilty plea was involuntarily given and that the trial court erred in failing to conduct a hearing or other detailed inquiry to establish the voluntariness of the plea before denying her motion to withdraw it. For reasons to be explained, we agree with the Appellate Division that the inquiry conducted by the court at the time of the withdrawal motion was sufficient and that the record demonstrates that defendant "intelligently, knowingly, and voluntarily entered her plea of guilty”
 
 (People v Fiumefreddo,
 
 188 AD2d 546, 547). Accordingly, there should be an affirmance.
 

 I
 

 The Crime
 

 The following evidence regarding the crime appears in the record in defendant’s presentence report, the guilty plea allocutions of defendant and her father, codefendant Salvatore Capriccioso, and in the confessions and guilty plea allocutions of Christopher Munroe, Joseph Gurrieri, and Frank Rich, the accomplices and coconspirators in the murder of Philip Fiumefreddo, defendant’s 73-year-old husband.
 

 There is evidence that defendant worked as a waitress at a diner in Staten Island, where she met Philip Fiumefreddo. After a two-month courtship, defendant and Fiumefreddo were married in February 1984; she was then 39 and he was 68. Throughout 4
 
 Vi
 
 years of marriage to Fiumefreddo, defendant often complained to acquaintances about him, stating that she wished him dead. In the early fall of 1988, she told acquaintances that her husband, who was making plans to divorce her, would be dead by Thanksgiving and indicated that she was arranging for someone to kill him.
 

 Sometime in early September, defendant’s father Salvatore Capriccioso withdrew $3,200 from the bank and gave it to defendant for the purpose of hiring someone to do the act. Defendant gave the $3,200 to a coemployee, but he decided he could not do it and gave the money back. She returned the funds to her father, who in early October gave the $3,200 to Frank Rich another of defendant’s coemployees. Rich, in turn, transferred the money to Joseph Gurrieri, also a coemployee, with the understanding that Gurrieri would arrange for the
 
 *540
 
 murder. Defendant discussed the "deal” she had made with Gurrieri with several other coemployees at the restaurant where she worked.
 

 Gurrieri, however, instead of arranging for the killing, spent the $3,200 on himself. Defendant kept pressing Gurrieri to perform the contract and threatened that he himself would be killed by an underworld figure if he did not follow through. Alarmed by her threat, Gurrieri, at the end of November, arranged to have Christopher Munroe kill Philip Fiumefreddo for $1,000. Munroe was to go to the Fiumefreddo residence on the morning of November 29 at 6:00 a.m. Defendant would let him in and then leave for work, thereby establishing her alibi. The initial attempt to carry out the plan on November 29 was aborted when Munroe somehow went to the wrong house but early in the morning on December 1 he arrived at the Fiumefreddo residence. Defendant let him in. After offering to fix breakfast for him, she told Munroe to make the house look burglarized, gave him a pillow, and instructed him to use it to kill her husband, who was still sleeping. She then left for work. Munroe suffocated Philip Fiumefreddo with the pillow as he slept.
 

 Gurrieri, who was to pay Munroe $1,000, could give him only $20 for the job. Becoming increasingly distressed about the murder, Gurrieri went to the police and confessed. On December 4, defendant, Munroe and Gurrieri were arrested. Two months later Rich and Capriccioso were arrested.
 

 The Negotiations and Guilty Pleas
 

 On February 6, 1989, defendant and her father were indicted for second degree murder, second degree conspiracy and second degree solicitation. On the same day Munroe, Gurrieri and Rich were indicted for various crimes in connection with the killing. These indictments and all matters including plea negotiations were handled by the same Supreme Court Justice in Richmond County. On February 10, Gurrieri pleaded guilty to conspiracy in the second degree. Munroe pleaded guilty to murder in the second degree on February 17 and during the plea allocution identified defendant, who was present in court, as the person who let him in the house on December 1, 1988 for the purpose of killing her husband. Rich pleaded guilty to criminal solicitation in the second degree on July 18 and, in defendant’s presence, stated that he had transferred the
 
 *541
 
 $3,200 to Gurrieri who was "supposed to find somebody to murder Joan Fiumefreddo’s husband”.
 

 Plea negotiations between defendant and the District Attorney were conducted over a period of several months during which defendant Fiumefreddo was represented first by attorney Diamond and then by attorney Collins. On March 6, 1990, the day jury selection was scheduled to begin, defendant and her attorney John Collins met for over an hour with the court, her father, his attorney Joseph Lamattina and the prosecutor. Immediately following this discussion, Collins told the court:
 

 "me. collins: * * * I’ve had extensive discussions with [defendant], with the Court, with the District Attorney, co-counsel and also with her father, who is here today as a co-defendant.
 

 "It is with respect to all the conversations we’ve had that my client
 
 is now prepared to plead with only one promise having been made by me. That promise is with her pleading to this top count that the Court would sentence her to 18 years to life”
 
 (emphasis added).
 

 Lamattina stated that defendant’s father was prepared to plead guilty to second degree conspiracy in exchange for a sentence promise of one to three years.
 

 In the ensuing plea allocution, which fills 18 pages of transcript, the court carefully established that defendant and codefendant Capriccioso voluntarily and with full knowledge of their rights and of the consequences of their pleas waived their rights to a jury trial, to remain silent, to confront witnesses, and to require the People to prove their guilt beyond a reasonable doubt. In the following colloquy with the court, defendant admitted doing the acts which are the basis for the indictment:
 

 "the court: Mrs. Fiumefreddo, I can’t take your plea unless you admit your guilt. Are you saying to me under count one of the indictment that on Staten Island on December 1, 1988, early in the morning
 
 you opened up your house door on Penn Avenue and let somebody into that house because you had arranged and you knew that that person was going to go upstairs and kill your husband while you were at work? Is that correct? Is that what you’re saying to me?
 

 
 *542
 
 "defendant fiumefreddo:
 
 Yes,
 
 Your Honor.
 

 "the court: And Mr. Capriccioso, are you saying to me that before December 1, 1988
 
 you had gone to Citibank, taken out money for the express purpose of paying somebody to go to your daughter’s house on Penn Avenue and kill your daughter’s husband? Is that what you’re saying to me?
 

 "defendant capriccioso:
 
 Yes.
 

 "the court: Satisfactory to the People?
 

 "mr. roller: Your Honor, just one further question that perhaps the Court may wish to direct to Mrs. Fiumefreddo. That is the monies taken out of the bank by her father, Mr. Capriccioso, that it was Mrs. Fiumefreddo who arranged to have those monies paid to a
 
 [sic]
 
 individual to effectuate the homicide of Mr. Fiumefreddo on the morning of December 1.
 

 "the court: That’s correct.
 
 You arranged to have your father take money out of the bank so you could arrange to have somebody come to your house to kill your husband; correct?
 

 "defendant fiumefreddo:
 
 Yes”
 
 (emphasis added).
 

 The court set the sentencing hearing for March 27, 1990.
 

 Defendant’s Withdrawal Motion
 

 On March 15, nine days after the plea colloquy, defendant made a motion
 
 pro se
 
 to withdraw her guilty plea. In the accompanying affidavit she stated that "while I acknowledge that the Court advised me that I had certain rights, I nevertheless did not then, nor do I now realize the full consequences of my plea of guilty. I am not guilty of the offenses to which I pleaded guilty * * * I continue to be confused about this matter because my attorney did not explain to me the ramifications of this guilty plea and I was unjustly rushed into pleading in this manner”. She further stated that she pleaded guilty "with the promise that I would be sentenced to 18 to life and codefendant which
 
 [sic]
 
 is the father of defendant whom
 
 [sic]
 
 is 78, that his sentence would be lighter if the defendant pleas
 
 [sic]
 
 guilty to” second degree murder.
 

 At the sentencing hearing on March 27, 1990, the court asked defendant why she had not brought up her confusion and feeling of coercion during the extensive questioning at the
 
 *543
 
 time of her guilty plea and allocution. She did not answer the question, but only repeated that she had been confused when she pleaded guilty. Although defendant maintained that she was "not guilty” in general terms, she at no time retracted any of her admissions or denied committing the specific acts with which she had been charged. The court denied the motion to withdraw her plea, ruling that she had failed to raise sufficient facts or grounds that would require a hearing. It sentenced defendant, and subsequently her father, to the agreed-upon terms of imprisonment.
 

 On appeal, defendant claimed that her plea bargain had been linked to that of her father and that she had been coerced into pleading guilty to secure the lighter sentence of one to three years for him. The Appellate Division affirmed the conviction, holding that "a guilty plea will not be held
 
 per se
 
 coercive, just because the defendant’s plea was conditioned upon a codefendant’s plea” and stating that "defendant’s plea allocution reveals that she intelligently, knowingly, and voluntarily entered her plea of guilty”
 
 (People v Fiumefreddo, supra,
 
 at 547).
 

 II
 

 The established rule is that a guilty plea will be upheld as valid if it was entered voluntarily, knowingly and intelligently
 
 (see, People v Moissett,
 
 76 NY2d 909, 910-911;
 
 People v Lopez,
 
 71 NY2d 662, 666). There must be an affirmative showing on the record that the defendant waived her constitutional privilege against self-incrimination and her rights to a jury trial and to be confronted by witnesses
 
 (see, Boykin v Alabama,
 
 395 US 238, 243, and n 5). This Court has consistently rejected a formalistic approach to guilty pleas, preferring instead to leave the ascertainment of whether the defendant has entered the plea voluntarily, knowingly and intelligently to the trial court’s "sound discretion exercised in cases on an individual basis”
 
 (People v Nixon,
 
 21 NY2d 338, 355). Thus, we have said repeatedly that there "is no requirement for a 'uniform mandatory catechism of pleading defendants’ ”
 
 (People v Harris,
 
 61 NY2d 9, 16 [quoting
 
 People v Nixon, supra,
 
 at 353]). On motions to withdraw guilty pleas, the "defendant should be afforded reasonable opportunity to present his contentions and the court should be enabled to make an informed determination in accordance with the principles laid down in
 
 People
 
 v.
 
 Nixon
 
 (21 N Y 2d 338) and associated cases”
 
 (People v Tinsley,
 
 
 *544
 
 35 NY2d 926, 927). But we have pointed out that the nature and extent of the fact-finding procedures on such motions rest largely in the discretion of the court and that "often a limited interrogation by the court will suffice”
 
 (id.,
 
 at 927).
 

 Defendant contends that her guilty plea should be assessed using different rules because the prosecution insisted that defendant and her codefendant father either both plead guilty or proceed to trial. We reject her first argument that such connected pleas are inherently coercive and, thus, cannot be upheld as valid. The Supreme Court, it should be noted, has specifically reserved judgment on "the constitutional implications of a prosecutor’s offer during plea bargaining of adverse or lenient treatment for some person
 
 other
 
 than the accused”
 
 (Bordenkircher v Hayes,
 
 434 US 357, 364, n 8 [emphasis in original]). The 11 Federal Courts of Appeals which have considered the matter, however, have upheld such pleas as valid
 
 (see, United State v Marquez,
 
 909 F2d 738, 741-742 [2d Cir 1990] [listing decisions in eight circuits in addition to the Second];
 
 United States v Seligsohn,
 
 981 F2d 1418, 1426 [3d Cir 1992];
 
 United States v Pollard,
 
 959 F2d 1011, 1020-1021 [DC Cir 1992]).
 

 While our Court has never passed on the issue, connected or wired pleas have been held to be legal in several Appellate Division decisions
 
 (see, People v Antonio,
 
 176 AD2d 528, 529;
 
 People v Cornielle,
 
 176 AD2d 190, 191;
 
 People v Bermudez,
 
 157 AD2d 533, 534;
 
 People v Keehner,
 
 28 AD2d 695;
 
 People v Henzey,
 
 24 AD2d 764). We see no reason for departing from the general rule expressed in the foregoing and other decisions:
 
 [1]
 
 i.e., that so long as the plea agreement is voluntarily, knowingly and intelligently made, the fact that it is linked to the prosecutor’s acceptance of a plea bargain favorable to a third person does not, by itself, make defendant’s plea illegal.
 

 Defendant contends, nevertheless, that even though connected pleas may not be invalid per se, the trial court erred in failing to give defendant’s guilty plea the heightened scrutiny that it required at the time of allocution and in denying her motion to withdraw her plea without a hearing or other detailed inquiry. She points to Federal cases recognizing that "guilty pleas made in consideration of lenient treatment as
 
 *545
 
 against third persons pose a greater danger of coercion than purely bilateral plea bargaining, and that, accordingly, 'special care must be taken to ascertain the voluntariness of guilty pleas entered in such circumstances”
 
 (United States v Nuckols,
 
 606 F2d 566, 569 [5th Cir 1979];
 
 see also, United States v Tursi,
 
 576 F2d 396, 398 [1st Cir 1978];
 
 Crow v United States,
 
 397 F2d 284, 285 [10th Cir 1968];
 
 but see, Marquez, supra,
 
 at 742;
 
 Pollard, supra,
 
 at 1020-1021). Defendant also relies on decisions of the California and Arizona Supreme Courts which require "an inquiry into the totality of the circumstances whenever a plea is taken pursuant to a 'package-deal’ bargain”
 
 (In re Ibarra,
 
 34 Cal 3d 277, 288, 666 P2d 980, 986,
 
 supra)
 
 and mandate that the court consider five enumerated factors including whether the prosecutor acted in good faith, whether there was a factual basis for the plea and whether the promise of leniency to the third person was a significant factor in defendant’s decision to plead guilty
 
 (see, State v Solano,
 
 150 Ariz 398, 724 P2d 17,
 
 supra).
 

 [2]
 

 We recognize that connected pleas can present concerns which require special care, particularly where leniency in a promised sentence for a loved one is part of the bargain. While the specific inquiries required by the California and Arizona courts may be relevant considerations in particular cases, we decline to adopt them or any other formalized procedure for determining the ultimate issue of whether a defendant’s connected guilty plea was voluntary. We believe that what seems to be the consensus view of the Federal courts is the proper approach: i.e., while a connected plea entailing benefit to a third person can place pressure on a defendant, the "inclusion of a third-party benefit in a plea bargain is simply one factor for a [trial] court to weigh in making the overall determination whether the plea is voluntarily entered”
 
 (Marquez, supra,
 
 at 742;
 
 see, Politte v United States,
 
 852 F2d 924, 930-931 [7th Cir 1988] [recognizing that
 
 *546
 
 connected pleas may require special care, but holding that the court should consider the totality of circumstances in determining the ultimate issue of voluntariness]). This rejection of any mandated procedure or ritualistic form in favor of a careful exercise of the court’s discretion on an individual basis is consistent with the policy that we have long followed in New York
 
 (see, People v Nixon, supra,
 
 at 355). Indeed, there is New York precedent for assessing the validity of connected pleas by viewing the tied-in nature of the plea as one factor to be carefully weighed with the totality of the circumstances in the determination of whether the plea was voluntary
 
 (see, People v Rodriguez,
 
 79 Misc 2d 1002 [Sup Ct, Bronx County, Sullivan, J.]).
 

 Ill
 

 We turn to the question of defendant’s plea. Recognizing that defendant’s connected plea presented a matter requiring special concern, we nonetheless conclude on our review of this record that it was knowingly, voluntarily and intelligently entered and that the trial court — given the voluminous evidence before it of defendant’s leading role in the crime— conducted a sufficient inquiry to deny the withdrawal motion without a formal hearing
 
 (see, People v Moissett, supra,
 
 at 910-911;
 
 People v Harris, supra,
 
 at 16;
 
 People v Tinsley, supra,
 
 at 927).
 

 Defendant’s plea had been the subject of negotiation for several months before it was accepted so that she had "sufficient opportunity to weigh 'the relative merits of the plea offered against the hazards of a trial’ ”
 
 (People v Esajerre,
 
 35 NY2d 463, 469). During the plea allocution, defendant unequivocally denied that any promises had been made to her other than that she would receive a sentence of 18 years to life in return for a plea of guilty to the top count. The lengthy and detailed colloquy with the court shows that she had no hesitancy about the plea she was entering
 
 (see, e.g., Pollard, supra,
 
 at 1022 [extensiveness of plea colloquy and defendant’s manifest willingness to plead during extensive colloquy considered significant factors in determination of voluntariness];
 
 see also, People v Esajerre, supra,
 
 at 466). During the allocution, defendant admitted to the court, forthrightly and with no suggestion of reluctance, that she had prevailed on her father to withdraw money from the bank for the purpose of hiring someone to have her husband killed. Not only did the court
 
 *547
 
 have the evidence of her admission to the precise facts charged in the indictment but these facts were corroborated by the contemporaneous admissions of her father made on the record in his plea allocution. Also, several months before the court had already taken the guilty pleas of Munroe, Rich and Gurrieri and was aware of their admissions and statements which left no doubt that it was defendant who conceived of the murderous scheme and who was the driving force in having it carried out. Thus, there can be no question that the court had an ample factual basis for accepting defendant’s plea
 
 (see, Ibarra,
 
 34 Cal 3d, at 289, 666 P2d, at 987,
 
 supra
 
 [presence of an adequate factual basis for a guilty plea a significant factor in assessing its voluntariness];
 
 see also, Politte, supra,
 
 at 930-931).
 

 The troubling aspect of the case, of course, is defendant’s relationship to her elderly and apparently ailing father and the concern that she would naturally be expected to have for his welfare
 
 (see, Marquez, supra,
 
 at 741-742;
 
 Politte, supra,
 
 at 930). But, we find no evidence that the prosecution acted in bad faith or improperly used the plea bargain with defendant’s father as a lever to put undue pressure on her to accept the offer of 18 years to life
 
 (see, Politte, supra,
 
 at 930;
 
 Ibarra,
 
 34 Cal 3d, at 289, 666 P2d, at 987,
 
 supra).
 
 Indeed, considering that defendant had originated and carried through with a plan for the cold-blooded execution of her husband, it appears that a sentence of 18 years to life would have been entirely appropriate and fair had the plea bargain been completely independent of her father’s plea. Defendant’s sentence was only three years more than the lowest permissible minimum sentence and seven years less than the highest minimum she could have received.
 
 [3]
 
 Defendant’s suggestion, therefore, that she was strongly influenced to accept the plea out of compassion for her father has a hollow ring for there is little reason to think that her sentence would have been any less even if unrelated to her father’s plea
 
 (see, Ibarra,
 
 34 Cal 3d, at 289-290, 666 P2d, at 987,
 
 supra
 
 ["a plea is not coerced if the promise of leniency to a third party was an
 
 insignificant consideration
 
 by a defendant in [her] choice to plead guilty” (emphasis added)]).
 

 
 *548
 
 Finally, we conclude that defendant’s claims of innocence and coercion did not necessitate a hearing and that the inquiry into these claims at the time of sentencing was adequate. We note, as did the sentencing court, that her contention of "not guilty” was little more than a perfunctory statement typed into a blank space on a form and that when given a chance at sentencing to expand on her moving affidavit by detailing this claim and her sense of coercion, she stated only "like I said, I requested I could have my plea back of guilty * * * the plea was under duress and that I wish that I reflect my feelings”. Here, it would have been better if the court had inquired further as to the basis for defendant’s withdrawal motion. Moreover, defendant’s withdrawal motion might have been obviated completely if the court, during the plea allocution, had elicited from defendant a statement that she was entering the plea solely because she deemed it to be in her own best interest and without any feeling of pressure or influence because of the plea bargain offered to her father. Nonetheless, at the sentencing hearing the record shows that the defendant was given a full opportunity to retract her specific admissions to the acts charged and to elaborate on her reasons for moving to withdraw her plea and her contention that she felt coerced. Under all of the circumstances, we cannot conclude that the sentencing court abused its discretion in failing to conduct a more detailed inquiry
 
 (see, Tinsley, supra,
 
 at 927).
 

 We agree with the Appellate Division that there is no basis for defendant’s claim that she was not provided meaningful representation by either of her counsel
 
 (see, People v Fiumefreddo, supra,
 
 at 547).
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Judges Simons, Titone, Bellacosa, Smith and Levine concur; Chief Judge Kaye taking no part.
 

 Order affirmed.
 

 [1]
 

 .
 
 See, e.g., State v Solano,
 
 150 Ariz 398, 724 P2d 17;
 
 In re Ibarra,
 
 34 Cal 3d 277, 666 P2d 980;
 
 People v Duran,
 
 179 Colo 129, 498 P2d 937;
 
 Wade v State,
 
 419 SE2d 781 (SC 1992);
 
 Seybold v State,
 
 61 Wis 2d 227, 212 NW2d 146.
 

 [2]
 

 .
 
 In
 
 Solano,
 
 the court upheld a connected plea applying the five
 
 Ibarra
 
 factors which it listed as follows: "(1) whether the inducement to plead was proper, in that the prosecutor acted in good faith and had a reasonable case against any third party to whom leniency is promised [citation omitted]; (2) whether there is a factual basis for the plea in terms of supportable evidence and proportionality of sentence; (3) whether the nature and degree of coercion and psychological pressure upon the defendant indicate the plea is involuntary; (4) whether the promise of leniency to another was a significant or insignificant concern to the defendant in his choice to plead guilty; and (5) whether any other relevant factor impermissibly influenced defendant’s plea”
 
 (Solano,
 
 150 Ariz, at 402, 724 P2d, at 21,
 
 supra).
 

 [3]
 

 . Penal Law § 60.05 (2) and § 70.00 provide that under an indeterminate sentence murder in the second degree as a class A-I felony
 
 (see,
 
 Penal Law § 125.25) carries a minimum term of imprisonment of not less than 15 nor more than 25 years and a maximum term of life imprisonment.